# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

PATRICK B.,
      Plaintiff,

      v.

COMMISSIONER OF SOCIAL
SECURITY,
      Defendant.

No. 3:19-cv-1697 (SRU)

## <u>ORDER</u>

In this Social Security appeal, Patrick B. moves to reverse the decision by the Social

Security Administration ("SSA") denying his claim for disability insurance benefits.  *See* Mot. to

Reverse, Doc. No. 21.  The Commissioner of the SSA (the "Commissioner") moves to affirm.

*See* Mot. to Affirm, Doc. No. 23.  For the following reasons, I **deny** Patrick B.'s motion and

**grant** the Commissioner's.

## I.      Standard of Review

The SSA follows a five-step process to evaluate disability claims.  *See Selian v. Astrue*,

708 F.3d 409, 417 (2d Cir. 2013).  First, the Commissioner determines whether the claimant

currently engages in "substantial gainful activity."  *Greek v. Colvin*, 802 F.3d 370, 373 n.2 (2d

Cir. 2015) (citing 20 C.F.R. § 404.1520(b)).  Second, if the claimant is not working, the

Commissioner determines whether the claimant has a "'severe' impairment," *i.e.*, a physical or

mental impairment that limits his or her ability to do work-related activities.  *Id.* (citing 20

C.F.R. §§ 404.1520(c), 404.1521).  Third, if the claimant does have a severe impairment, the

Commissioner determines whether the impairment is considered "*per se* disabling" under SSA

regulations.  *Id.* (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526).  If the impairment is not

*per se* disabling, then, before proceeding to step four, the Commissioner determines the

claimant's "residual functional capacity" ("RFC") based on "all the relevant medical and other evidence of record." *Id.* (citing 20 C.F.R. §§ 404.1520(a)(4), (e), 404.1545(a)).  A claimant's RFC is defined as "what the claimant can still do despite the limitations imposed by his impairment." *Id.*  Fourth, the Commissioner decides whether the claimant's RFC allows him to return to "past relevant work." *Id.* (citing 20 C.F.R. §§ 404.1520(e), (f), 404.1560(b)).  Fifth, if the claimant cannot perform past relevant work, the Commissioner determines, based on the claimant's RFC, whether the claimant can do "other work existing in significant numbers in the national economy." *Id.* (citing 20 C.F.R. §§ 404.1520(g), 404.1560(b)).  The process is sequential, meaning that a claimant is disabled only if he passes all five steps.  *See id.*

"The claimant bears the ultimate burden of proving that he was disabled throughout the period for which benefits are sought," as well as the burden of proof in the first four steps of the five-step inquiry.  *Id.* at 374 (citing 20 C.F.R. § 404.1512(a)); *Selian*, 708 F.3d at 418.  If the claimant passes the first four steps, however, there is a "limited burden shift to the Commissioner at step five." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).  At step five, the Commissioner need show only that "there is work in the national economy that the claimant can do; he need not provide additional evidence of the claimant's" RFC.  *Id.*

In reviewing a decision by the Commissioner, I conduct a "plenary review" of the administrative record but do not decide *de novo* whether a claimant is disabled.  *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012); *see also Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) ("[T]he reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.").  I may reverse the Commissioner's decision "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole." *Greek*,

802 F.3d at 374–75.  The "substantial evidence" standard is "very deferential," but it requires "more than a mere scintilla."  *Brault*, 683 F.3d at 447–48.  Rather, substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Greek*, 802 F.3d at 375 (cleaned up).  Unless the Commissioner relied on an incorrect interpretation of the law, "[i]f there is substantial evidence to support the determination, it must be upheld."  *Selian*, 708 F.3d at 417.

## II.    Facts

### A.    Medical Background

Patrick B. was severely injured in an accident in April 2016.  On April 28, 2016, Patrick B. and a friend were cleaning a spark plug with alcohol when the spark plug accidentally set on fire.  R. at 38, 410.  Patrick B. was engulfed in flames.  Patrick B. then either ran into or was thrown into a wall in an attempt to put out the flames.  *Compare id.* at 404 (ran) *with id.* at 410 (thrown).  As a result of hitting the wall, Patrick B. injured his upper back; he was eventually diagnosed with myelopathy from central cord syndrome.  *Id.* at 1065.  According to Patrick B., when he hit the wall, he was temporarily paralyzed.  *Id.* at 411.  However, as soon as the day after his accident, Patrick B. was walking around.  *Id.* at 418; *see also id.* at 433 (noting on May 1 that Patrick B.'s "[l]eft upper and lower extremities" had "full active and passive [range of motion] to all joints without pain or tenderness"); *id.* at 435 (reporting on May 2 that Patrick B. was "able to move all extremities" and, although he had "mild numbness/tingling to all extremities," Patrick B. "report[ed] sensation and motor movement is slowly getting better daily").

Right after his accident, Patrick B. was brought to Danbury Hospital, but he was quickly transferred to the Bridgeport Hospital Burn Unit.  *Id.* at 405.  Patrick B. had suffered burns

mostly to the right side of his body that covered approximately 10 percent of his total body surface area.  *Id.*  On May 5, Patrick B. underwent burn debridement and grafting surgery.  *Id.* at 469–70.  On May 7 or 8, Patrick B. was transferred to the Yale New Haven Hospital Rehabilitation and Wellness Center in Milford, Connecticut.  Patrick B. stayed there until May 13, when he was discharged.  *Id.* at 575, 629.  During his stay at the Rehabilitation Center, several notes commented on the progress Patrick B. seemed to be making.[1]

Over the next month, Patrick B. saw two doctors, both of whom recommended that Patrick B. have surgery on his upper back.[2]  On June 6, Patrick B. visited neurosurgeon Michael E. Opalak.  Dr. Opalak observed that Patrick B. had "a sensation of numbness and clumsiness in both hands," and "some weakness in muscles."  *Id.* at 1065.  Dr. Opalak "believe[d] he is going to require surgical treatment," and referred Patrick B. to an orthopedic surgeon, Dr. David B. Brown.  *Id.*  On June 13, Patrick B. saw Dr. Brown, who wrote that Patrick B. was "known to have essentially a central cord syndrome with multilevel cervical spondylosis and marked central canal stenosis with cord impingement at the C4-C5 and C5-C6 levels."  *Id.* at 1092.  Patrick B. reported "prominent numbness and parasthesias involving the finger of the left hand greater than right."  *Id.*  Patrick B. also reported "an ataxic gait with short periods of walking or standing."

---

[1] *See* R. at 560 (May 8:  "Musculoskeletal: no acute inflammation, no tenderness."  "Neurological: alert and oriented to person, place, and time."); *id.* at 566 (May 9:  "Musk skel: no acute swelling , no deformities."); *id.* at 577 (May 9:  "[A]lert and oriented to person, place, and time . . . .  [I]mp[a]ired fine motor coordination of the bilateral UE."); *id.* at 342 (May 9:  "Neurological:  He is alert and oriented to person, place, and time.  No cranial nerve deficit.  [I]mp[a]ired fine motor coordination of the bilateral UE."); *id.* at 348 (May 9:  "At least 4/5 strength in the upper ext on SABD, EF, EE, grasp on the right and 3/5 on the left[.]  At least 4/5 strength in the bilateral LE on HF, KE, ADP, APF[.]"); *id.* at 607, 609 (May 11:  noting no musculoskeletal issues and remarking that Patrick B. "has eloped unit on more than one occasion"); *id.* at 614 (May 12:  "Musk skel: no acute swelling , no deformities."); *id.* at 395–96 (May 13:  noting that Patrick B. was "[m]oving all extremities" and remarking:  "Pt [out of bed] to chair.  Amb independently ad lib.  Steady **gait** noted.  Tol well."  "The patient has eloped the unit today at least 2 times to smoke outside."); *id.* at 627 (May 13:  "Independent with transfers and walking with no **assistive device** at least 1000 feet.  The patient is modified independent to go up and down 12, 6 inch steps[.]").

[2] On May 17, Patrick B. also had an appointment at the Seifert & Ford Family Community Health Center in Danbury.  There, a doctor examined Patrick B. and noted, among other things, that he had "no motor or sensory losses/changes" and was "[n]egative for joint paint, joint swelling,[] or morning stiffness."  R. at 827.

*Id.*  Dr. Brown explained the possible spinal surgery and specifically told Patrick B. that "[t]here are no guarantees that symptoms will be completely relieved following even the most successful surgical treatment."  *Id.*  Patrick B. elected to proceed with surgery.

On June 12, 2016, which was the day before Patrick B. visited Dr. Brown, Patrick B. had submitted an activities of daily living report to the SSA as part of his claim for disability.  In that submission, Patrick B. explained that his daily routine was:  "Rest, walk to stretch, rest, walk to stretch."  *Id.* at 213.  Patrick B. wrote that he went outside independently on a daily basis and could both walk and drive a car.  *Id.* at 216.  Patrick B. also noted that he:  could walk a quarter mile, pause, and then resume walking after 15 to 20 minutes; did laundry, but needed help carrying it to the laundromat and folding it; shopped by himself in stores for ready-made meals 2-3 times per week for an hour; could care for his hair; could shave "slowly"; could (slowly) dress and feed himself; could use the toilet; could handle his own finances; and did not need reminders to take his medicine.  *Id.* at 214–19.

On June 16, 2016, Dr. Opalak and Dr. Brown performed spinal surgery on Patrick B. at Bridgeport Hospital.  *Id.* at 792–99.  The surgery was successful—post-operation, Patrick B. was "moving both upper and lower extremities on command."  *Id.* at 796.  The following day (June 17), hospital officials observed Patrick B. "ambulating in room, getting dressed and moving objects around the room."  *Id.* at 802.  On June 18, Patrick B. reported to hospital personnel that he was "so much better than I was yesterday," and was received "standing in room."  *Id.* at 808.  Patrick B. reported "improved overall sensation in" his extremities but also continued "tingling" in his hands, more in the left than the right.  *Id.* at 809.  Hospital personnel also noted that Patrick B. was mostly independent "with mobility in the room, and was [independent] taking a shower on first PT attempt of the day."  *Id.*

In the following months, Patrick B. made numerous visits to a community health center in Danbury and to Dr. Brown and Dr. Opalak.  On June 23, July 12, and August 2, Patrick B. attended follow-up appointments at a community health center in Danbury.  *Id.* at 879–86.  On June 23, the evaluating doctor reported that the "[s]urgery went well 1 week ago," but Patrick B. "continues to feel numbness and tingling in hands." *Id.* at 885.  On July 12, Patrick B. "state[d] the pain [wa]s stable but now [was] having neurological deficits." *Id.* at 882.  However, the examining doctor reported that Patrick B. was "alert and oriented x3" and that he had "5/5 strength on 4 extremities." *Id.*  On August 2, Patrick B. reported that the situation had worsened, and the evaluating doctor noted:  "I am afraid that his pain syndrome has changed – and does not seem related to original neck injury." *Id.* at 880.  However, also on August 2, the evaluating doctor wrote that Patrick B. had "motor 5/5 bilaterally proximally and distally in all 4 extremities." *Id.* at 879.

On August 5, Patrick B. returned to see Dr. Opalak, who reported that Patrick B. "has improved his strength and fine movements on his arms." *Id.* at 1064.  Dr. Opalak noted that Patrick B. was "still better on the right than the left and he is still a little clumsier on the left hand." *Id.*  Dr. Opalak continued:  "He still has a feeling of numbness in his fingers and legs but his gait is better." *Id.*  Dr. Opalak concluded:  "I am satisfied with the result." *Id.*

On October 5, Patrick B. went to see Dr. Brown for a follow up appointment.  Patrick B. reported to Dr. Brown that he had "improved strength to the upper extremities and . . . that his balance is somewhat better with prolonged walking." *Id.* at 1091.  Dr. Brown observed that although "[t]here is still restricted motion on rotation and flexion," there was also "improved strength bilaterally of the upper extremities." *Id.*  Patrick B. was "still walking with an ataxic gait." *Id.*

On October 7, 14, and 22, Patrick B. walked into the emergency department at Danbury Hospital seeking more pain medication.  *Id.* at 970–1013.  During his October 14 walk-in, the examining medical professional noted, among other things, that Patrick B. had "5+ out of 5+ motor strength and 2+ reflexes in upper and lower extremities."  *Id.* at 994.

On November 18, Patrick B. returned to Dr. Brown.  Patrick B. told Dr. Brown that he "continue[d] to be aware of improved strength to the upper extremities."  *Id.* at 1090.  Patrick B. also noted "prominent pain to the left arm" and "numbness to the feet," but stated that he had "been able to walk up to 20 minutes at a time."  *Id.*  Dr. Brown noted that although Patrick B. still had "restricted motion of the cervical spine," Patrick B. was suffering from "no new neurological deficit."  *Id.*  Dr. Brown ordered an MRI based on "persistent left arm pain."  *Id.*  Patrick B. had that MRI on December 2.

On December 12, Patrick B. returned again to see Dr. Brown.  Although the MRI revealed "[n]o significant change," Dr. Brown noted that:

> The claimant does have some ongoing degree of left arm pain and ongoing ataxia. He may be a candidate for posterior decompression.  The claimant is totally disabled for any form of gainful employment.  He cannot work even in a light duty capacity due to ongoing neck, arm, and leg pain with significant ataxia limiting his ability to walk more than 20 minutes at a time.

*Id.* at 1046.

On January 4, 2017, Patrick B. returned to see Dr. Opalak, who noted that Patrick B. "has greater strength."  *Id.* at 1053.  According to Dr. Opalak, Patrick B. "still has some evidence of myelopathy that is improving but as I told him there is no guarantee that any of this will completely disappear."  *Id.*  Dr. Opalak expressed some concern that Patrick B. was "still using a fair amount of pain medication" and wrote:  "I think he should be started on physical therapy and I told him that I was not going to renew his pain medications."  *Id.*

On January 23, Patrick B. underwent a physical consultative examination with Dr. Anne

Granata at Connecticut Disability Determination Services ("CDDS"). Dr. Granata repeatedly

noted Patrick B.'s slow and ataxic gait, his greatly limited range of motion, his general

discomfort in sitting and laying down, and his pain and numbness. *Id.* at 1055–59. However,

Dr. Granata also wrote that Patrick B. was "independent with activities of daily living in an

adapted fashion." *Id.* at 1056. Dr. Granata also noted Patrick B.'s apparently undiminished

strength: Patrick B. had "5/5" muscle strength in his shoulders and right leg, and "4/5" muscle

strength in his hips and left leg. *Id.* at 1057. Finally, Dr. Granata noted that Patrick B. "is able to

squat, but had to hold on to furniture to arise." *Id.* at 1058.

On February 1, State agency medical consultant Dr. Barbara Coughlin considered the

above medical evidence and gave an initial disability determination explanation. Even though

Dr. Coughlin found that Patrick B. had a severe spinal disorder and a non-severe soft tissue

injury (burn), Dr. Coughlin opined that Patrick B. was not disabled. *Id.* at 88, 92.[3]

On May 15, Patrick B. returned to see Dr. Brown. Patrick B.'s "main complaint" was

"prominent back pain with radiation to the left leg associated with a sense of weakness." *Id.* at

1088. Patrick B. also complained of "a sense of bilateral upper extremity weakness" and "a

---

[3] Based on her review of the above medical records, Dr. Coughlin catalogued the following exertional
limitations. Patrick B. could frequently (between one-third and two-thirds of eight-hour workday) lift and/or carry
10 pounds; stand and/or walk (with normal breaks) for two hours in an eight-hour workday; and sit (with normal
breaks) for the remaining six hours. R. at 89–90. Dr. Coughlin also found that Patrick B. had the following postural
limitations. Patrick B. could: occasionally climb ramps/stairs, stoop, kneel, crouch, and crawl; and never climb
ladders/ropes/scaffoldings, or balance. Patrick B. did "not need [an] assistive device for all ambulation but [it] may
be used for distance/rough ground/pain relief/balance." *Id.* at 90. Patrick B. "would be able to carry papers/folders,
etc. in opposite hand." *Id.* Dr. Coughlin found that Patrick B. had no manipulative, visual, and communicative
limitations. *Id.* And Dr. Coughlin concluded that Patrick B. had the following environmental limitations: Patrick
B. should avoid concentrated exposure to vibration and all exposure to hazards, such as machinery and heights. *Id.*
at 90–91.

sense of weakness to the left leg." *Id.* Dr. Brown sent Patrick B. to get further MRI exams on both his cervical and lumbar spine. *Id.* On June 9, Patrick B. received those two MRIs.[4]

On June 19, Patrick B. returned to Dr. Brown to discuss the MRI results. Patrick B. reported "improvement in arm pain" but still complained of "back pain extending to the legs." *Id.* at 1087. Dr. Brown observed: "There seems to be good strength of both upper extremities." *Id.* Dr. Brown then referred Patrick B. to Dr. Opalak for neurosurgical consideration of lumbar surgery.

On June 26, Patrick B. saw Dr. Opalak for that consultation. Dr. Opalak noted that Patrick B. "has continued to complain of some degree of numbness in his arms though he feels his strength has markedly improved compared to pre-operative." *Id.* at 1062. Although Patrick B. complained of pain in his "lower back radiating into his left leg," Dr. Opalak observed that Patrick B. "has good strength on most of his lower extremity except for left foot dorsa[l] flexion." *Id.* Dr. Opalak "agree[d] with Dr. Brown that [Patrick B.] needs at least an L3-4, L4-5 decompressive laminectomy and perhaps L5, S1." *Id.* On July 13, Patrick B. returned to see Dr. Brown and was still complaining of left leg pain. *Id.* at 1086. It was agreed that Patrick B. would undergo lumbar decompression and fusion surgery. *Id.* Ultimately, that surgery did not happen until October 2019. *See* Patrick B.'s Mem. of Law in Supp. Mot. to Reverse, Doc. No. 21-1, at 15 ("Patrick B.'s Mem. of Law").[5]

---

[4] The results of the MRI on Patrick B.'s cervical spine were "essentially unchanged" from the results of his December 2, 2016 MRI. R. at 1080–81. The MRI on Patrick B.'s lumbar spine revealed "[m]ultilevel degenerative changes," "impingement of the exiting left L5 nerve root at L5-S1," and possible "mild impingement of both exiting L3 nerve roots at L3–4." *Id.* at 1082–83.

[5] When Patrick B. was admitted to the hospital for lumbar surgery in July 2017, the anesthesiologist discovered that Patrick B. had recently tested positive for cocaine, and so the surgery was canceled. R. at 1085, 1108. Patrick B. claims that his positive cocaine test was a false positive. Confusingly, though, Patrick B. also admitted that he used cocaine just a week before his surgery was scheduled. *Id.* at 63.

On July 18, Patrick B. walked into Connecticut Counseling Centers ("CCC") for a substance abuse evaluation. *See* R. at 1122–34. Patrick B. had "a 20 year history of opiate abuse" and was "voluntarily seeking admission into" the Methadone Maintenance Treatment Program because he was being discontinued from his pain medication. *Id.* at 1133–34. The evaluator that day asked Patrick B. "if he thought he was employable," to which Patrick B. responded: "maybe, [but] it would have to be limited work, my back and neck are pretty well messed up." *Id.* at 1133. The evaluator also noted that Patrick B. "reported having 10 close friends, and said he has had close relationships with his: Mother, Father, Brothers/sisters, Sexual partner, Children, Friends." *Id.* at 1132. Patrick B. explained that "he spends most of his free time with friends and is satisfied with spending free time this way. He said he has exercised on 30 of the past 30 days." *Id.* The evaluator also noted that Patrick B. "said he is not at all bothered by social or family problems." *Id.*

On July 19, Patrick B. saw Dana Martinez, Psy.D., for a consultative mental status examination. *See id.* at 1072–75. (Patrick B. had been referred to Dr. Martinez after his January 23 appointment with Dr. Granata at CDDS.) Dr. Martinez noted Patrick B.'s complaints of depression and anxiety (and resultant anger) and catalogued his history of abusing illegal and prescription drugs. *Id.* at 1072–73. Dr. Martinez also noted that Patrick B. "slurred many of his words," "sounded sleepy," and had poor eye-contact and a flat affect. *Id.* at 1073. Dr. Martinez also remarked that Patrick B.'s "ability to concentrate" appeared relatively weak and that his "[i]nsight and introspective abilities appeared limited." *Id.* Dr. Martinez also memorialized Patrick B.'s complaints regarding his chronic pain. For those reasons, Dr. Martinez concluded that Patrick B.'s "anger may result in difficult relationships with supervisors, coworkers, and the general public." *Id.* at 1074.

However, Dr. Martinez also made several observations that were not so dire.  For instance, Dr. Martinez noted that Patrick B. "arrived promptly and independently via cab." *Id.* at 1073.  Dr. Martinez noticed that Patrick B. "ambulated independently and stiffly," and was "able to arise from the couch without difficulty and exit the office independently." *Id.*  Further, Patrick B. was "able to remain seated throughout the evaluation without reported or observed difficulty or pain." *Id.*  And Dr. Martinez reported that Patrick B.'s "[a]ttention, concentration, and long and short-term memory are intact." *Id.* at 1074.  Finally, Dr. Martinez noted that Patrick B. "appears capable of managing his finances in his own best interests." *Id.*

On July 20, Patrick B. again saw Dr. Opalak, who noted that Patrick B.'s "symptoms are worse with activity" and "decreased with rest and medication." *Id.* at 1107.  However, Dr. Opalak reported that Patrick B. "has improved markedly regarding his initial symptoms of myelopathy." *Id.*  Upon physical examination, Dr. Opalak explained that Patrick B. had "5/5 grasp bilaterally." *Id.*  In his gait, Patrick B. "[f]avors his left leg." *Id.*

On August 2, Patrick B. returned to Dr. Brown.  There, Dr. Brown relayed that Patrick B. was still complaining of "ongoing low back and intermittent left leg pain." *Id.* at 1085.  Dr. Brown indicated that Patrick B. would "enter[] a Methadone Clinic in Danbury" and "will be rescheduled for lumbar fusion surgery pending drug detoxification." *Id.*

On August 9, in a physical exam at CCC, the evaluating medical professional indicated, among other things, that Patrick B. had "good strength [in] all extremities," "moves all extremities," and had a "[s]teady gait." *Id.* at 1127.

On September 18, State agency medical consultants Russell Phillips, Ph.D., and Dr. Joseph Connolly, Jr., completed a disability determination explanation on Patrick B.'s request for reconsideration. *See id.* at 95–114.  The evaluation considered the above medical records and

evidence.  In addition to his old complaints, Patrick B. also asserted a claim of post-traumatic

stress disorder as a result of his being set on fire.  *Id.* at 96.  Relying mostly on Dr. Martinez's

report—there were no mental health records other than those—Dr. Phillips concluded that

Patrick B. had a severe impairment of depressive, bipolar, or a related disorder.  *Id.* at 106.

However, Dr. Phillips concluded that Patrick B. was not disabled based on that severe

impairment.  *Id.* at 106, 110–11.[6]  Overall, Dr. Phillips commented that Patrick B. "continues to

be independent in his daily mental functioning" and that there was "no evidence of any sustained

marked mental limitations."  *Id.* at 111.  "Considering his mental impairment only," Dr. Phillips

wrote, "the claimant is able to persist at simple tasks over time under ordinary conditions."  *Id.*

With respect to his physical limitations (spinal disorder and burns), Dr. Connolly re-affirmed Dr.

Coughlin's assessment that Patrick B. was not disabled and, specifically, the RFC that Dr.

Coughlin had determined.  *See id.* at 107–09; *supra* n.3.  In doing so, Dr. Connolly considered

particularly notes from Patrick B.'s visits to Dr. Opalak on January 4, June 26, and July 27.  R. at

109.

B.     Administrative Proceedings

On May 24, 2016, Patrick B. filed his initial application for supplemental security income

("SSI").  *Id.* at 185–92.  In that application, Patrick B. alleged a disability onset date of April 14,

---

[6] Dr. Phillips found that Patrick B. had the following mental RFC.  Patrick B. had a mild impairment with respect to his ability to understand, remember, or apply information; that is, Patrick B. "can understand and reliably recall simple information."  R. at 106, 110.  Patrick B. was moderately impaired in his ability to interact with others, meaning that he "can tolerate the minimum social demands of simple-task settings."  *Id.* at 106, 111.  Patrick B. was mildly impaired in his ability to concentrate, persist, or maintain pace; in other words, Patrick B. "can maintain attention for two hours at a time and persist at simple tasks over eight- and forty-hour periods with normal supervision."  *Id.*  Finally, Patrick B. suffered from a mild impairment in his ability to adapt or manage himself, meaning that he "can tolerate simple changes in routine, avoid hazards, travel independently, and make/carry out simple plans."  *Id.*

2016.  *Id.* at 185.[7]  As described above, on February 3, 2017, Patrick B.'s initial application for

SSI was denied.  *Id.* at 73–93.  On March 27, Patrick B. filed an appeal seeking reconsideration.

*Id.* at 122.  On September 21, Patrick B.'s application for reconsideration was also denied.  *Id.* at

94–114.  Sometime thereafter Patrick B. filed a request for a hearing before an ALJ.  And on

November 28, the SSA acknowledged Patrick B.'s request.  *Id.* at 127.

On August 30, 2018, that hearing took place in New Haven, Connecticut before ALJ

Brien Horan.  *Id.* at 30–72.  On September 13, the ALJ issued a written decision holding that

Patrick B. "has not been under a disability" from the date of his initial SSI application through

the date of the hearing.  *Id.* at 9–29.  On November 12, Patrick B. requested review of the ALJ's

decision.  *Id.* at 182–84.  On August 22, 2019, the SSA's Appeals Council denied Patrick B.'s

request for review.  *Id.* at 2–6.  Thus, on October 31, Patrick B. filed this case.

      C.    <u>Hearing</u>

At the August 30 hearing, two witnesses testified:  Patrick B. and Warren Maxim, a

vocational expert ("VE").  Before the hearing began, Patrick B. asked to stand because he had

been sitting for an hour straight, which was "extremely painful."  *Id.* at 33.  Patrick B. testified

about his past work in construction job-site cleanup.  Patrick B. explained that he had been able

to carry 80-pound bundles up ladders.  *Id.* at 37–38.

Regarding his burns, Patrick B. explained that they were "very painful and very

uncomfortable," and the burns on his legs were "very irritating if I have pants rubbing on it."  *Id.*

at 39.  Patrick B. also complained about frequent migraines relating to his spinal injury.  *Id.* at

---

[7]  Patrick B.'s alleged disability onset date—April 14, 2016—is confusing because Patrick B.'s injury occurred on April 28, 2016.  It is unclear how Patrick B. may have been disabled before the accident that caused his injury.

40–45.  Patrick B. admitted that he if took ibuprofen, although it "takes about an hour for that to kick in," it "does help a lot."  *Id.* at 42.

Regarding his spinal disorders, Patrick B. testified that he suffers from pins and needles, numbness, and pain in his left shoulder, left elbow, several fingers on his left hand,[8] in his lower back and groin region, down both legs, and into his feet.  *Id.* at 40–41, 47–50.  Patrick B. claimed that the numbness in his feet has caused him to fall "a lot."  *Id.* at 50.  Patrick B. explained that, to manage his pain, he went to a methadone clinic every day (except Sunday) to obtain methadone.  *Id.* at 55.  Patrick B. said that the methadone "seems to work great, it really does." *Id.* at 56.

Patrick B. testified about numerous factors bearing on his physical functioning capacity. For instance, Patrick B. asserted that he could not sit for more than five minutes "without shifting my weight one way or another" and that "after maybe five, ten minutes I have to get up and stand up."  *Id.* at 52.  Similarly, Patrick B. said that he likes to "hold on to something" when standing and, after five or ten minutes, he "prefer[s] to sit down."  *Id.*  Patrick B. testified that he was not strong enough to carry a gallon of milk around his kitchen and so switched to half gallons.  *Id.* at 46.  Patrick B. thus asserted that he "[p]robably [could] not" carry 10 pounds on a daily basis. *Id.* at 47.  When asked if he could "walk mail around an office building and deliver it to offices," Patrick B. replied that he would "have to stop periodically and take breaks but, I don't know, that varies from day to day."  *Id.* at 54.  Patrick B. testified that he does "[f]ine" on stairs, "as long as I have something to hold on to" because his "balance is not very good."  *Id.* at 50.  More specifically, Patrick B. explained that he can ascend a flight of "[s]hort stairs" without stopping, but not "long stairs."  *Id.* at 51.

---

[8]  Patrick B. reported that his "right arm seems to be a lot better" than his left arm.  *See* R. at 46.

Patrick B. also testified about several factors relevant to his mental functioning capacity. Patrick B. explained that he sleeps a lot—somewhere between 10 and 15 hours per day. *Id.* at 54–55. Patrick B. said that he was being medicated for his depression and anxiety, that he saw a counselor twice per week at CCC, and that he saw a psychiatrist once per month. *Id.* at 57. Patrick B. reported getting along with others and described a best friend who lived in Milford. *Id.* at 58–59. However, Patrick B. then backtracked and said that "no matter where I am it's like I just want to go and be by myself." *Id.* at 58. Patrick B. claimed that he could "not really" concentrate on any task for two hours at a time. *Id.* at 59.

The VE testified that Patrick B.'s past work was active and agreed with the ALJ that Patrick B. would not be able to return to it because Patrick B. could now do only sedentary work. *Id.* at 65–66. The ALJ asked the VE several hypotheticals that assumed RFCs closely resembling those found by the State agency medical consultants in their disability determination evaluations.

In the first hypothetical, the ALJ asked the VE whether jobs exist in the national economy for a hypothetical individual who could perform sedentary work except for the following limitations:  (1) no balancing, (2) no climbing ladders, ropes, and stairs, (3) occasional stooping, kneeling, crouching, crawling, and climbing ramps and scaffolds, (4) occasional reaching with bilateral upper extremities, (5) frequent handling and fingering with the bilateral upper extremities, (6) use of a handheld assistive device as needed for distance or uneven terrain or pain relief or balance while holding papers or folders in the opposite hand, (7) occasional exposure to vibration, (8) no exposure to hazards such as unprotected heights and moving parts of machinery, and (9) no job duties involving operation of a motor vehicle. *Id.* at 66. The VE

replied that there was one job in the national economy that such a hypothetical person could do: surveillance system monitor, of which there are 24,000 jobs nationally. *Id.* at 67–68.

The second hypothetical was the same as the first, except that in the second hypothetical, the hypothetical individual could perform "only occasional [rather than frequent] handling and fingering and feeling with the left hand." *Id.* at 68. The VE again explained that surveillance system monitor was the only job available in the national economy for such a person. *Id.*

In the third hypothetical,[9] the ALJ asked the VE to assume the same individual as in the second hypothetical, but with the following additional limitations: (1) limited to simple routine tasks, (2) limited to frequent interaction with supervisors, and occasional interaction with the general public, and (3) limited to simple work-related decisions. *Id.* at 69. The VE explained that the same job—surveillance system monitor—was the only job available in the national economy for such a person.

The ALJ then asked the VE a series of questions about the job of a surveillance system monitor. First, the ALJ asked whether a surveillance system monitor could perform his job if he needed to alternate standing and sitting every 15-to-30 minutes. The VE said that such a limitation would not be a problem "as long as the individual did not need to leave the workstation." *Id.* Next, the ALJ asked whether a surveillance system monitor could be off task more than 10 or 15 percent of the workday—or more than two days per month—because of various health problems. The VE opined that those lapses in attendance would be unacceptable and that such a person could not perform the job of a surveillance system monitor. *Id.* at 69–70. The VE's testimony relied on both the Dictionary of Occupational Titles and his own professional experience. *Id.* at 70–71. In response to a question from Patrick B.'s attorney, the

---

[9] Technically, I describe the fourth hypothetical. It appears that the ALJ asked the same hypothetical twice as hypotheticals two and three, and the VE gave the same answers. *See* R. at 67–68.

VE noted that the figure of 24,000 jobs in the national economy came from the Department of Labor's occupational employment quarterly estimate data. *Id.* at 71.

 D.   The ALJ's Decision

 The ALJ concluded that Patrick B. had not been under a disability since May 2016, when he filed his application for SSI benefits. *Id.* at 12. At step one of the five-step analysis, the ALJ found that Patrick B. had not worked since May 19, 2016. *Id.* at 14. At step two, the ALJ found that Patrick B. suffered from the following severe impairments: (1) degenerative disc disease of the cervical spine and lumbar spine, (2) soft tissue burns, (3) osteoarthritis, (4) major depressive disorder, and (5) substance abuse disorder. *Id.*

 At step three, the ALJ held that Patrick B.'s impairments, individually and collectively, did not render him *per se* disabled according to the definitions in 20 C.F.R. Pt. 404, Subpt. P, App. 1. Regarding spinal disorders, the ALJ held that Patrick B. did "not have the requisite neurological deficits" that are required under listing 1.04. *Id.* at 15. Regarding burns, the ALJ held—without elaborating—that Patrick B.'s "burns to his arms and legs do not meet the criteria" for soft-tissue injuries under listing 1.02. *Id.*

 The ALJ also held that Patrick B.'s mental impairments failed to meet the criteria for depressive, bipolar, and related disorders under listing 12.04. *Id.* at 15; *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1 (listing 12.04). Regarding the paragraph B criteria,[10] the ALJ found that Patrick B. had a "mild" limitation in understanding, remembering, and applying information; a

---

[10] To be *per se* disabled under listing 12.04, Patrick B.'s mental conditions needed to satisfy either the "paragraph B" or "paragraph C" criteria. The "paragraph B" criteria evaluate how well a claimant can: (a) understand, remember, or apply information, (b) interact with others, (c) concentrate, persist, or maintain pace, and (d) adapt or manage oneself. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 (listing 12.00A2b). In evaluating those four areas of functional limitation, the Commissioner will "will use the following five-point scale: None, mild, moderate, marked, and extreme." 20 C.F.R. § 416.920a(c)(4). "To satisfy the paragraph B criteria, your mental disorder must result in extreme limitation of one, or marked limitation of two, paragraph B areas of mental functioning." 20 C.F.R. Pt. 404, Subpt. P, App. 1 (listing 12.00F2).

"moderate" limitation interacting with others; a "mild" limitation concentrating, persisting, or maintaining pace; and a "mild" limitation adapting or managing himself.  R. at 16.  Those were the same limitations found by Dr. Phillips in his mental RFC assessment.  *Id.* at 106.  Put otherwise, the ALJ explained that Patrick B. "functions independently" and "care[s] for his own personal needs."  *Id.* at 16.  With respect to the paragraph C criteria,[11] the ALJ found that Patrick B. did not have "a highly supported environment or that he required significant assistance to maintain adaptive functioning."  *Id.*  That conclusion also was consistent with Dr. Phillips' findings.  *Id.* at 106.

Before proceeding to the fourth step, the ALJ determined Patrick B.'s RFC.  Specifically, the ALJ found that Patrick B. could perform the full range of sedentary work with the following limitations:

- He may never balance or climb ladders, ropes, or scaffolds;
- He may occasionally stoop, kneel, crouch, crawl, and climb ramps and stairs;
- He may perform occasional reaching;
- He may perform occasional handling, fingering, and feeling with the bilateral upper extremities;
- He may use a handheld assistive device as needed for distance, uneven terrain, pain relief, or balance, while holding papers or folders in the opposite hand;
- He may have occasional exposure to vibration;
- He may have no exposure to hazards, such as unprotected heights and moving parts of machinery;
- He may have no job duties involving operation of a motor vehicle;
- He requires an at-will, sit-stand option every 15-30 minutes, while continuing to remain at his workstation;
- He can perform simple, routine tasks with frequent interaction with supervisors and occasional interaction with the general public; and

---

[11] To meet the "paragraph C" criteria, the claimant's "mental disorder must be 'serious and persistent,'" which means that there must be "a medically documented history of the existence of the disorder over a period of at least 2 years, and evidence that satisfies the criteria in both C1 and C2."  20 C.F.R. Pt. 404, Subpt. P, App. 1 (listing 12.00A2c).  "The criterion in C1 is satisfied when the evidence shows that you rely, on an ongoing basis, upon medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s), to diminish the symptoms and signs of your mental disorder."  20 C.F.R. Pt. 404, Subpt. P, App. 1 (listing 12.00G2b).  "The criterion in C2 is satisfied when the evidence shows that, despite your diminished symptoms and signs, you have achieved only marginal adjustment," which means that "your adaptation to the requirements of daily life is fragile."  20 C.F.R. Pt. 404, Subpt. P, App. 1 (listing 12.00G2c).

- The work should involve only simple, work-related decisions.

*Id.* at 17.

The ALJ found that Patrick B.'s medically determinable impairments "could reasonably be expected to cause [Patrick B.'s] alleged symptoms," but held that Patrick B.'s "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in this record." *Id.* at 18.  More specifically, the ALJ held that Patrick B. had "underestimate[d]" his functional abilities.  *Id.* Indeed, according to the ALJ:  "[N]one of the medical records detail[s] any significant loss of strength such that the claimant could not lift and/or carry to the extent of the" RFC.  *Id.* at 19.  To support that assertion, the ALJ cited numerous medical records—including office notes from Patrick B.'s visits to his treating physicians, Dr. Opalak and Dr. Brown—throughout 2016 and 2017.  *Id.*  The ALJ acknowledged that Patrick B.'s lumbar spine issues presented "some complications," but Patrick B. "ha[d] not sought the recommended lumbar surgery, which was reportedly delayed due to his cocaine use."  *Id.* at 19–20; *see also supra* n.5.

Regarding Patrick B.'s mental RFC, the ALJ accepted that Patrick B. "has some limitations due to his mental health impairments," but noted that several limitations in the RFC—the simplicity of the work tasks and the level of interaction with supervisors and the general public—reflected that fact.  *Id.* at 20.  The ALJ observed that "[t]he record shows no actual mental health treatment."  *Id.*  Finally, the ALJ examined the evidence regarding Patrick B.'s substance abuse disorder and concluded that, even considering that evidence, Patrick B. was not disabled.  *Id.*; *see also* 20 C.F.R. § 416.935.

In determining Patrick B.'s RFC, the ALJ weighed the relevant medical opinions as follows:

- "great weight" to the opinions of the non-examining State agency medical consultants with respect to Patrick B.'s physical RFC on initial review and reconsideration;

- "probative weight" to the opinions of Dr. Granata, who consultatively examined Patrick B. in January 2017;

- "significant weight" to Dr. Martinez's opinions in the July 2017 consultative examination; and

- "no weight" to the statements by Dr. Brown from his December 12, 2016 office note that Patrick B. "is totally disabled for any form of gainful employment," and "cannot work even in a light duty capacity."

R. at 21.

At step four, the ALJ determined that, given that RFC, Patrick B. was unable to perform his past relevant work. *Id.* at 22. At the fifth and final step, the ALJ considered whether Patrick B.—who was 46 years old when the application was filed, had left school in the 11th grade, and had worked many years "as a laborer doing roofing, siding, and gutters," *id.* at 22—could do other work "exist[ing] in significant numbers in the national economy." 20 C.F.R. § 404.1560(c)(1); *see also* R. at 23. Relying on the VE's testimony, the ALJ concluded that Patrick B. was capable of "making a successful adjustment to other work that exists in the significant numbers in the national economy," specifically, the job of "[s]urveillance system monitor (DOT 379.367-010), performed at the sedentary exertional level, unskilled, with a SVP of 2, with an estimated 24,000 jobs in the national economy." *Id.* at 23–24.[12]

Thus, the ALJ concluded that Patrick B. "has not been under a disability, as defined in the Social Security Act, since May 19, 2016." *Id.* at 24.

### III.    Discussion

---

[12]   The ALJ overruled Patrick B.'s counsel's objection to the VE's testimony regarding "the provision of job numbers and job incidence data." R. at 61 (Patrick B.'s attorney objecting), 23–24 (ALJ overruling objection).

On appeal, Patrick B. argues that the ALJ erred by (1) finding, at step three, that Patrick B. was not *per se* disabled under listings 1.02 and/or 1.04, (2) assigning improper weight to the relevant medical opinions from treating and non-treating sources in assessing Patrick B.'s RFC, and (3) finding, at step five, that Patrick B. could engage in substantial gainful employment because the significant and numerous restrictions the ALJ noted actually leave Patrick B. functionally incapable of work. *See generally* Patrick B.'s Mem. of Law, Doc. No. 21-1, at 4–5. The Commissioner counters that (1) substantial evidence supported the ALJ's finding that Patrick B. was not *per se* disabled under listings 1.02 and/or 1.04, (2) the ALJ properly weighed the relevant medical opinions, and (3) the ALJ's step five finding was supported by substantial evidence. *See generally* Comm'rs Mem. of Law in Supp. Mot. to Affirm, Doc. No. 23-1 ("Comm'rs Mem. of Law").

A.     Substantial Evidence Supports the ALJ's Decision at Step Three.

Patrick B. argues that the ALJ erred in finding that Patrick B. was not *per se* disabled under listing 1.02 (major dysfunction of a joint) and/or listing 1.04 (disorders of the spine) because those findings were "not supported by and [were] contrary to evidence in the record." Patrick B.'s Mem. of Law, Doc. No. 21-1, at 4. Patrick B. offers 15 bullet points that cite to various medical records and claims that those medical records are "ample evidence . . . supporting the finding that Claimant was suffering from severe limitations as a result of a disorder of the spine and joints." *Id.* at 9–15.

The Commissioner disagrees. The Commissioner notes that Patrick B. needed to satisfy *all* the criteria in listings 1.02 and 1.04 to be *per se* disabled under those listings. *See* Comm'rs Mem. of Law, Doc. No. 23-1, at 4. Here, the Commissioner concedes that Patrick B. "had cervical spine degeneration at multiple levels and lumbar spine degeneration with root

21

impingement." *Id.* (citing R. at 1050, 1083).  But Patrick B. did not establish that "his spinal conditions caused motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss," as required by listing 1.04.  *Id.* at 5.  Indeed, "examination findings showed that Plaintiff was neurologically intact, he had near-to-full strength in the upper and lower extremities, and no acute musculoskeletal inflammation or tenderness." *Id.* at 4.  And, with respect to listing 1.02, Patrick B. did not establish "that he is unable to ambulate effectively." *Id.* at 5.

A different ALJ might have decided Patrick B.'s claim differently.  There is certainly evidence in the record that weighs heavily in Patrick B.'s favor.  However, I affirm the ALJ's decision because it was based on more than a scintilla of evidence.  *See Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).  "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria."  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).  "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Id.*; *see also Murillo v. Saul*, 2020 WL 1502194, at *4 (D. Conn. Mar. 30, 2020).

To match listing 1.04, a claimant must show that a disorder of the spine "result[ed] in compromise of a nerve root . . . or the spinal cord" along with either (A) "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)," (B) "[s]pinal arachnoiditis," or (C) "[l]umbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in

inability to ambulate effectively, as defined in 1.00B2b." 20 C.F.R. Pt. 404, Subpt. P, App. 1
(listing 1.04).

In this case, the ALJ held that Patrick B.'s impairments did not meet or medically equal
listing 1.04 because Patrick B. did "not have the requisite neurological deficits." R. at 15.
Although the ALJ mentioned only a lack of neurological deficits in the step three analysis, I am
entitled to look elsewhere in his decision—to more thorough discussions of the evidence,
particularly in the RFC section—to glean more of the ALJ's rationale. *See Salmini v. Comm'r of
Soc. Sec.*, 371 F. App'x 109, 112–13 (2d Cir. 2010) (citing *Mongeur*, 722 F.2d at 1040);
*Zellweger v. Saul*, 984 F.3d 1251, 1254–55 (7th Cir. 2021). It is clear from the ALJ's
subsequent discussion regarding Patrick B.'s RFC that the ALJ relied on Patrick B.'s lack of
"motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by
sensory or reflex loss" in finding that Patrick B. was not *per se* disabled under listing 1.04.

Substantial evidence supports the ALJ's conclusion. That is especially clear with respect
to Patrick B.'s muscle strength. For instance, even in the days after his accident, medical
personnel at the Yale New Haven Hospital Rehabilitation and Wellness Center remarked that
Patrick B. had 4/5 strength in his upper right extremity and both lower extremities and 3/5
strength in his upper left extremity. *See* R. at 348; *see supra* n.1. Before his surgery in June
2016, further medical professionals remarked that Patrick B. had "no motor or sensory
losses/changes" and was "[n]egative for joint paint, joint swelling,[] or morning stiffness." R. at
827.

In the months following his surgery, numerous medical professionals continued to
comment on Patrick B.'s returning strength. *See, e.g.*, *id.* at 882 (doctor reporting on July 12 that
Patrick B. was "alert and oriented x3" and that he had "5/5 strength on 4 extremities"); *id.* at 879

23

(doctor reporting on August 2 that Patrick B. had "motor 5/5 bilaterally proximally and distally in all 4 extremities"); *id.* at 1064 (Dr. Opalak reporting on August 5 that Patrick B. "has improved his strength and fine movements on his arms"); *id.* at 1091 (Dr. Brown reporting on October 5 that Patrick B. had "improved strength bilaterally of the upper extremities"); *id.* at 994 (hospital personnel commenting on October 14 that Patrick B. had "5+ out of 5+ motor strength and 2+ reflexes in upper and lower extremities").

Continuing into 2017, medical professionals continued to note Patrick B.'s strength.  *See id.* at 1053 (Dr. Opalak noting on January 4, 2017, that Patrick B. "has greater strength"); *id.* at 1057 (Dr. Granata remarking during January 23 consultative exam that Patrick B. had "5/5" muscle strength in his shoulders and right leg and "4/5" muscle strength in his hips and left leg). Almost a year after his surgery, examining doctors continued to memorialize Patrick B.'s strength.  *See id.* at 1087 (Dr. Brown observing on June 19 that "[t]here seems to be good strength of both upper extremities"); *id.* at 1062 (Dr. Opalak noting on June 26 that Patrick B. "ha[d] good strength on most of his lower extremity except for left foot dorsa[l] flexion"); *id.* at 1107 (Dr. Opalak noting on July 20 that Patrick B. had "5/5 grasp bilaterally"); *id.* at 1127 (evaluating medical professional at CCC remarking on August 9 that Patrick B. had "good strength [in] all extremities").  All of the above medical records amount to substantial evidence supporting the ALJ's determination that Patrick B. was not *per se* disabled under listing 1.04.[13]

The ALJ's decision did not discuss listing 1.02, and it does not appear, in my view, that Patrick B. advanced any such argument below.  Thus, it is possible that Patrick B. has waived

---

[13] Although the foregoing focuses on subparagraph (A) of listing 1.04, I note that Patrick B. could also have been *per se* disabled by meeting the criteria in subparagraphs (B) or (C).  But it is clear in context that those are not the avenues that Patrick B. pursues, and, in any event, he is not *per se* disabled under either of those subparagraphs.  Patrick B. cannot satisfy the criteria in subparagraph (B) because no medical records suggest that he suffers from spinal arachnoiditis.  And Patrick B. cannot satisfy the criteria in subparagraph (C) because, even assuming that he met most of the definition, as I explain below, Patrick B. cannot establish that he could not ambulate effectively.

this argument.  *See Lewis v. Berryhill*, 2018 WL 1377303, at *4–6 (D. Conn. Mar. 19, 2018);

*Torres v. Colvin*, 2016 WL 1182978, at *4 (D. Conn. Mar. 28, 2016).  However, the

Commissioner does not argue that Patrick B. waived his challenge, so I consider it on the merits.

To be *per se* disabled under listing 1.02, Patrick B. would need to show major

dysfunction of a joint that was "[c]haracterized by gross anatomical deformity . . . and chronic

joint pain and stiffness with signs of limitation of motion or other abnormal motion of the

affected joint(s), and findings on appropriate medically acceptable imaging of joint space

narrowing, bony destruction, or ankylosis of the affected joint(s)."  20 C.F.R. Pt. 404, Subpt. P,

App. 1 (listing 1.02).  Patrick B. would also have to show either (1) "[i]nvolvement of one major

peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate

effectively" or (2) "[i]nvolvement of one major peripheral joint in each upper extremity (i.e.,

shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements

effectively."  *Id.*

Patrick B. does not clearly articulate his theory of *per se* disability under listing 1.02.  No

matter what theory, though, Patrick B. bears the burden of establishing that he suffers from a *per*

*se* disability.  *See Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).  Patrick B. cannot carry

that burden because he cannot show that he either suffered from (a) an inability to ambulate

effectively or (b) an inability to perform fine and gross movements effectively.  *See Reices-*

*Colon v. Astrue*, 523 F. App'x 796, 799 (2d Cir. 2013) (addressing a waived argument and

denying plaintiff's claim based on plaintiff's burden and the record evidence).

Regarding (a), Patrick B. cannot establish that he is unable to ambulate effectively.  *See*

20 C.F.R. Pt. 404, Subpt. P, App. 1 (listing 1.00B2b).  The ability to ambulate effectively is

defined as being "capable of sustaining a reasonable walking pace over a sufficient distance to be

able to carry out activities of daily living." *Id.*  The corollary—an inability to ambulate

effectively—means "an extreme limitation of the ability to walk" that occurs generally when an

individual has "insufficient lower extremity functioning . . . to permit independent ambulation

without the use of a hand-held assistive device[] that limits the functioning of both upper

extremities." *Id.*  To be sure, on numerous occasions, medical professionals noted that Patrick B.

walked with an "ataxic" gait and did not walk smoothly.  *See, e.g.*, R. at 1055–59, 1091–92.

However, Patrick B. was able to walk with, at most, a hand-held device requiring the use of one

of his arms, *see id*. at 88 (cane), and to carry out many functions of his activities of daily living.

For instance, during the post-accident, pre-surgery period of April through June 2016, Patrick B.

was up and walking, and in fact eloped his medical unit on several occasions.  *See, e.g.*, *id.* at

418, 627, 802; *see supra* n.1.  Indeed, Patrick B. reported to the SSA that he could walk a quarter

mile, does laundry, and can shop for an hour.  R. at 213–18.  In a July 19, 2017 meeting with Dr.

Martinez, Patrick B. "arrived promptly and independently via cab."  *Id.* at 1073.  At the August

2018 hearing, Patrick B. testified that he might be able to walk around an office building to

deliver mail, based on the day, and that he could climb stairs, especially if he had something to

hold onto.  *Id.* at 50–51, 54.  Patrick B. also explained that he independently went to and from a

methadone clinic every day.  *Id.* at 55.  In sum, Patrick B. cannot establish that he was incapable

of ambulating effectively.

Patrick B. also cannot establish that he suffered from an "inability to perform fine and

gross movements effectively."  The "inability to perform fine and gross movements effectively"

means "an extreme loss of function of both upper extremities" that "interferes very seriously

with the individual's ability to independently initiate, sustain, or complete activities."  20 C.F.R.

Pt. 404, Subpt. P, App. 1 (listing 1.00B2c).  "To use their upper extremities effectively,

individuals must be capable of sustaining such functions as reaching, pushing, pulling, grasping, and fingering to be able to carry out activities of daily living." *Id.*

In my view, Patrick B. cannot establish that he suffers from an "extreme loss of function" to either of his upper extremities. That is especially clear with respect to his right arm. The medical records in this case consistently indicate that Patrick B. had significantly less of an issue with his right arm than with his left arm. *See, e.g.*, R. at 348 (in May 2016 Patrick B. had 4/5 strength in his right arm and 3/5 strength in his left arm), 1092 (in June 2016 Patrick B. had numbness in his "left hand greater than [the] right"), 1064 (in August 2016 Patrick B. was "still better on the right than the left"), 40–43 (at August 2018 hearing Patrick B. reported problems with his left arm but not his right arm), 46 (at August 2018 hearing, the ALJ asked Patrick B. whether he could "reach out ahead of you to do things," and Patrick B. replied that his "right arm seems to be a lot better, but my left arm very difficult."). To be sure, the record reflects that Patrick B. consistently suffered from some pain and numbness/tingling in his left arm, elbow, and several fingers on his left hand. Even those issues, though, do not indicate that Patrick B. could not reach, push, pull, grasp, or finger adequately to carry out activities of daily living. For instance, in the days following his June 2016 surgery, Patrick B. could shower independently. *Id.* at 809. Also in June 2016, Patrick B. reported to the SSA that he could do laundry, shop for an hour, and (slowly) clothe himself. *Id.* at 213–18. And at the August 2018 hearing, Patrick B. confirmed he could shower independently and carry around a half-gallon of milk in his home. *Id.* at 46, 53. As described above, too, Patrick B. consistently took himself to and from medical and social appointments. For those reasons, even if Patrick B. has not waived his argument regarding listing 1.02, he cannot show that he suffered from a *per se* disability under that listing.

B.     The ALJ Properly Weighed the Medical Opinions.

27

Patrick B. takes issue with the fact that the ALJ gave "no weight to opinion evidence of Dr. David Brown" and "did not specifically explain why." Patrick B.'s Mem. of Law, Doc. No. 21-1, at 15. Although Dr. Brown had been treating Patrick B. since 2016, performed cervical spinal surgery on him, and—in several office notes—described Patrick B.'s symptoms, the ALJ's decision did "not articulate any comparison or citation to conflicts or specific inconsistencies found within the record and Dr. Brown's opinion regarding Claimant's inability to function." *Id.* at 17. Patrick B. also points out that "opinions concerning Claimant's restrictions within the notes of Dr. Michael Opalak are not afforded a[ny] weight." *Id.* at 18.

Again, the Commissioner disagrees. The Commissioner notes that the ALJ properly accorded "no weight" to Dr. Brown's opinions that Patrick B. was "totally disabled" and "could not work in a light duty capacity." Comm'rs Mem. of Law, Doc. No. 23-1, at 6. Further, the Commissioner argues that the ALJ did not overlook Dr. Opalak's medical opinions because Dr. Opalak did not render any medical opinions. *Id.* at 7 (noting that Dr. Opalak "did not provide any functional restrictions for" Patrick B., and, instead, reported that Patrick B. was improving in strength and gait) (citing R. at 924, 1053, 1062–65, 1107). In contract, the Commissioner notes, the ALJ properly afforded "great weight" to the opinions of State agency physicians Dr. Coughlin and Dr. Connolly because those opinions "were consistent with the record evidence." *Id.*

Pursuant to the "treating physician" rule, "[t]he opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record.'" *Matta v. Astrue*, 508 F. App'x 53, 57 (2d Cir. 2013) (quoting *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008); 20

C.F.R. § 404.1527(d)(2)) (cleaned up).  "While the opinions of a treating physician deserve special respect, they need not be given controlling weight where they are contradicted by other substantial evidence in the record." *Bavaro v. Astrue*, 413 F. App'x 382, 384 (2d Cir. 2011) (quoting *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002)).  In determining the weight to afford a treating physician's medical opinion, "the ALJ considers the examining relationship, the treatment relationship, the length of treatment, the nature and extent of treatment, evidence in support of the medical opinion, consistency with the record, specialty in the medical field, and any other relevant factors." *Mondschein v. Saul*, 2020 WL 4364058, at *7 (D. Conn. July 30, 2020).

In my view, the ALJ did not err in weighing the medical opinions as he did.  Medical opinions are statements "that reflect judgments about the nature and severity" of a claimant's impairment, "including your symptoms, diagnosis and prognosis, what you can still do despite impairment[], and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1).  The parties' major dispute regards Dr. Brown's statements from a December 12, 2016 office note that Patrick B. was (1) "totally disabled for any form of gainful employment," and (2) "cannot work even in a light duty capacity due to ongoing neck, arm, and leg pain with significant ataxia limiting his ability to walk more than 20 minutes at a time."  R. at 1046.

Regarding (1), the ALJ correctly afforded that opinion no weight.  Dr. Brown's opinion that Patrick B. was "totally disabled for any form of gainful employment" is not a medical opinion but, rather, an administrative finding that would be dispositive of this case.  Such a remark is not entitled to any weight.  *See Trepanier v. Comm'r of Soc. Sec. Admin.*, 752 F. App'x 75, 77 (2d Cir. 2018) ("A bald statement that a claimant is 'disabled' represents an administrative finding, not a medical opinion."); *see also* 20 C.F.R. § 404.1527(d)(1).

Regarding (2), the ALJ also did not err in affording Dr. Brown's opinion no weight, but that is a closer call.  The ALJ held that Dr. Brown's opinion regarding Patrick B.'s inability to perform "even . . . light duty capacity" work deserved no weight because it "offers no function-by-function analysis."  R. at 21.  Although Patrick B. does not press the argument, in my view, that reasoning is faulty.  An ALJ has an affirmative duty to develop the administrative record and to "fill any clear gaps."  *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).  Several district courts in this Circuit have remarked that a treating physician's failure to include a function-by-function analysis in reaching a medical opinion is "not a good reason for discounting" that opinion.  *See Parker v. Comm'r of Soc. Sec. Admin.*, 2019 WL 4386050, at *8 (S.D.N.Y. Sept. 13, 2019); *Moreau v. Berryhill*, 2018 WL 1316197, at *11–13 (D. Conn. Mar. 14, 2018); *Mondschein*, 2020 WL 4364058, at *8.  Instead, an ALJ might ask that treating physician to supplement the record with a more specific opinion.

However, the ALJ's failure to develop the record in that way in this case does not require remand.  "[R]emand is not always required when an ALJ fails in his duty to request opinions, particularly where . . . the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity."  *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013); *see also Ramos v. Berryhill*, 2019 WL 3543659, at *8 (D. Conn. Aug. 5, 2019) ("Although the record does not contain formal opinions on [the claimant's RFC] from her treating physicians, the breadth and depth of medical records available from both before and during the alleged disabling period were adequate for the ALJ to assess residual functional capacity."); *Moreau*, 2018 WL 1316197, at *12 (noting that, in some cases in which ALJs failed to develop the record regarding a treating source's opinion, courts did not remand the case to the

SSA "because, even without further development of that treating source's opinion, the record was sufficiently complete for the ALJ to make a substantially supported RFC determination").

The record in this case is voluminous and includes hospital records, radiology reports, office treatment notes from numerous doctors, surgical notes, several consultative examination reports, and intake notes from community health centers.  At the hearing in this matter, Patrick B.'s counsel confirmed that "the record [is] complete."  R. at 33; *cf. Ramos*, 2019 WL 3543659, at *8.  Indeed, Patrick B.'s counsel does not argue that the record is incomplete—I raise the issue *sua sponte*.[14]  For those reasons, the ALJ's failure to develop the record does not require remand.[15]

For many of the reasons that I have already highlighted above, the ALJ was entitled to conclude that Dr. Brown's "light duty capacity" opinion was inconsistent with the record. Medical records confirmed that Patrick B. had significant strength in all his extremities, was capable of walking short distances, independently handled various chores and other activities of daily living, and took himself to numerous medical and social appointments.  *See, e.g.*, *supra* n.1; R. at 50–54, 213–19, 879, 882, 994, 1053, 1055–59, 1064, 1073–74, 1087, 1091, 1107, 1127.[16] The ALJ did not err in assigning the weights he did to the medical opinions of record.

---

[14]  The closest that Patrick B. comes to raising this issue is citing *Rosa v. Callahan*, 168 F.3d 72 (2d Cir. 1999), and noting that *Rosa* "explains the administrative law judge's obligation to fill gaps in the administrative record prior to rejecting a treating physician's diagnosis."  Patrick B.'s Mem. of Law, Doc. No. 21-2, at 16.

[15]  Importantly, the ALJ did not ignore medical records from Patrick B.'s two treating physicians (Dr. Brown and Dr. Opalak).  Instead, the ALJ took those records into account and, in fact, relied on many of Dr. Brown's and Dr. Opalak's office notes in recounting Patrick B.'s medical history in detail.  R. at 19–20.  Relatedly, although Patrick B. complains that the ALJ overlooked Dr. Opalak's opinions, Patrick B. does not identify any such opinions.  My independent review of Dr. Opalak's notes confirms that Dr. Opalak did not render any "medical opinions."  20 C.F.R. § 404.1527.  Indeed, Dr. Opalak's treatment notes, at least in places, contradict Dr. Brown's medical opinion that Patrick B. could not perform even "light duty capacity" work.  For instance, Dr. Opalak repeatedly cited Patrick B.'s strength.  R. at 924 (Aug. 5, 2016:  Patrick B. "has improved his strength and fine movements on his arms" and "his gait is better"), 1053 (Jan. 4, 2017:  "He has greater strength").

[16]  I also note that Dr. Brown's medical opinion, even if the ALJ had assigned it some weight, would likely not have altered the ALJ's ultimate RFC determination.  That is because Dr. Brown's opinion that Patrick B. "cannot work even in a light duty capacity," R. at 1046, does not appear inconsistent with the ALJ's RFC determination.  More specifically, Dr. Brown was apparently opining that, in his view, Patrick B. could not do what

C.     Substantial Evidence Supports the ALJ's Decision at Step Five.

Patrick B. claims that the ALJ's RFC determination "leaves the Claimant without any realistic work capacity." Patrick B.'s Mem. of Law, Doc. No. 21-1, at 19. According to Patrick B., if the position of surveillance system monitor "(at only 24,000 jobs in the national economy) is the only sedentary job with that number of restrictions that a hypothetical claimant could perform, this person is really unemployable." *Id.* at 20. Patrick B. also argues that two questions that the ALJ asked the VE at the hearing—and which the VE answered in ways that would have disqualified Patrick B. from being able to work as a surveillance system monitor—were improperly excluded from the ALJ's RFC determination.[17]

In the Commissioner's view, Patrick B. misunderstands the relevant standard. The Commissioner need show only one job in the national economy existing in significant numbers that Patrick B. can perform. To the extent that Patrick B. argues the ALJ should have incorporated the VE's answers to *all* of the ALJ's questions—especially the ones that seemed to

---

the SSA categorizes as "[l]ight work." "Light work" involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds," and possibly "a good deal of walking or standing," or, at least, "some pushing and pulling of arm or leg controls" while sitting. 20 C.F.R. § 404.1567(b). The ALJ *agreed* that Patrick B. could not do light work. That is why the RFC contemplates only *sedentary* work, which involves substantially less physical exertion, such as "lifting no more than 10 pounds at a time" and occasional "walking and standing." *Id.* at 404.1567(a).

[17] Patrick B. also makes another argument in this section of his brief that seems out of place. Patrick B. argues that the ALJ's RFC determination did not consider Dr. Martinez's observations. *See* Patrick B.'s Mem. of Law, Doc. No. 21-1, at 20–21 (claiming that "[n]ot all of the[] limitations [found by] the Social Security consultative examiner were included in the" ALJ's RFC determination). In contrast, the Commissioner contends that the ALJ did consider Dr. Martinez's opinions by limiting Patrick B. to "only frequent, *i.e.* not constant, interaction with supervisors and occasional interaction with the general public." Comm'rs Mem. of Law, Doc. No. 23-1, at 8. Further, "Dr. Martinez's finding that Plaintiff had intact attention, concentration, and memory supports the ALJ's RFC finding that Plaintiff can perform simple and routine tasks." *Id.*

I agree with the Commissioner. First, the ALJ explicitly addressed Dr. Martinez's opinions and assigned them "significant weight." R. at 21. Additionally, the ALJ "accept[ed] that the claimant has some limitations due to his mental health impairments," and the RFC determination reflected that by limiting Patrick B. to "performing simple, routine tasks, with frequent interaction with supervisors and occasional interaction with the general public" and engaging in "only simple, work-related decisions." *Id.* at 20. In my view, the ALJ's RFC determination reflects Dr. Martinez's opinions and observations. To the extent that the ALJ's RFC determination does not reflect every single one of Dr. Martinez's observations, it need not. *See Galiotti v. Astrue*, 266 F. App'x 66, 67 (2d Cir. 2008) ("[T]he Commissioner need not 'reconcile explicitly every conflicting shred of medical testimony.'") (quoting *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983)).

favor Patrick B.—the Commissioner notes that that was not necessary if the ALJ concluded that the relevant limitations were not established by the record.  *See* Comm'rs Mem. of Law, Doc. No. 23-1, at 9.

The ALJ did not err in his decision at step five.  Patrick B.'s first complaint—that the ALJ's RFC determination actually leaves the claimant unemployable—is wrong because the ALJ found that Patrick B. was capable of performing one job that exists in the national economy in significant numbers.  *See Bavaro*, 413 F. App'x at 384 ("The Commissioner need show only one job existing in the national economy that Bavaro can perform.").  The narrowness of that employment opportunity may seem unfair to Patrick B., and I understand that frustration.[18]  But that does not mean that the ALJ relied on an incorrect interpretation of the law or that his determination was not supported by substantial evidence.

The ALJ also did not err by ultimately not relying on some of the VE's testimony.  More specifically, the ALJ asked the VE whether an individual who (1) had to be off-task more than 10 or 15 percent of the workday or (2) had to miss two days of work per month due to medical problems could still do the job of system surveillance monitor.  *See* R. at 69–70.  The VE replied that such a hypothetical individual likely could *not* do that job.  *See id.*  Those questions and answers were absent from the ALJ's ultimate RFC determination.  "An ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as there is substantial record evidence to support the assumptions upon which the vocational expert based his opinion and accurately reflect the limitations and capabilities of the claimant involved."  *McIntyre v. Colvin*,

---

[18]  Although a single job with an estimated 24,000 jobs nationally (with no regional breakdown) may seem extremely restrictive, "[c]ourts have generally held that what constitutes a 'significant' number is fairly minimal." *Ramos*, 2019 WL 3543659, at *11 (cleaned up).  Indeed, district courts in this Circuit routinely hold that anything above 10,000 jobs nationally is enough to satisfy the Commissioner's burden at step five. *See George v. Saul*, 2020 WL 6054654, at *5 (D. Conn. Oct. 14, 2020); *Poole v. Saul*, 462 F. Supp. 3d 137, 165–66 (D. Conn. 2020).

758 F.3d 146, 151 (2d Cir. 2014) (cleaned up).  As a corollary to that rule, when the ALJ

ultimately finds that the impetus for a hypothetical question was *not* credibly established by the

record, he or she need not credit the VE's response to that hypothetical question.  *See Dumas v.*

*Schweiker*, 712 F.2d 1545, 1554 n.4 (2d Cir. 1983); *see also Seney v. Comm'r of Soc. Sec.*, 585

F. App'x 805, 809 (3d Cir. 2014).  In this case, the ALJ implicitly found that the record did not

establish that Patrick B. would need to be off-task at least 10 percent of the workday or that

Patrick B. would need to miss two days of work per month.[19]  For many of the same reasons that

I have already highlighted above, the ALJ did not err in reaching that conclusion.

## IV.    Conclusion

For the foregoing reasons, I **deny** Patrick B.'s motion to reverse the decision of the

Commissioner, doc. no. 21, and **grant** the Commissioner's motion to affirm, doc. no. 23.  The

Clerk shall enter judgment for the Commissioner and close the case.


So ordered.

Dated at Bridgeport, Connecticut, this 23rd day of March 2021.


                                                          /s/ STEFAN R. UNDERHILL
                                                          Stefan R. Underhill
                                                          United States District Judge

---

[19]  The ALJ's reasoning for asking those questions is absent from the record.  For instance, neither
limitation was noted by the State agency physicians in their disability determinations.  *See* R. at 74–93, 95–114.

34